## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RAYMOND VARGAS,** | Civ. No. 15–2502 (KM) |
| **Plaintiff,** | |
| **v.** | |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,** | **OPINION** |
| **Defendant.** | |

**KEVIN MCNULTY, U.S.D.J.:**

Raymond Vargas brings this action pursuant to 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401–434. For the reasons set forth below, the decision of the Administrative Law Judge ("ALJ") is AFFIRMED.

## I.   BACKGROUND

Mr. Vargas seeks to reverse an ALJ's finding that he was not disabled from August 30, 2011, through August 2, 2013, the date of the ALJ's decision. (R. 28)[1]

Mr. Vargas applied for SSI on August 30, 2011,[2] claiming that he was disabled since June 2, 2011 due to injured knees and a lower back problem.

---

[1]   Pages of the administrative record (ECF no. 7) are cited as "R. __."

1

(R. 53, 118) His application was denied initially on December 7, 2011 (R. 67–71), and upon reconsideration on May 24, 2012 (R. 77–79). On August 2, 2013, following a hearing at which Mr. Vargas testified and was represented by counsel (R. 29–51), ALJ Richard West found that Vargas was not under a "disability" as defined in the Social Security Act. (R. 21–28). On February 2, 2015, the Appeals Council denied Vargas's request for review (R. 1–5), rendering the ALJ's decision the final decision of the Commissioner. Mr. Vargas now appeals that decision.

## II.   DISCUSSION

To be eligible for SSI benefits, a claimant must meet the income and resource limitations of 42 U.S.C. § 1382. A claimant must also show that he is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A); *see, e.g., Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 503 (3d Cir. 2009).

### A.   Five-Step Process and this Court's Standard of Review

Under the authority of the Social Security Act, the Social Security Administration (the "Commissioner") has established a five-step evaluation process for determining whether a claimant is entitled to SSI benefits. 20 C.F.R. § 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

---

[2]   Vargas's Disability Determination and Transmittal forms date his application filing to August 30, 2011. (R. 52, 59) However, the Application Summary sent to Vargas states that he applied for SSI on September 7, 2011. (R. 118)

2

**Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 C.F.R. § 416.920(b). If not, move to step two.

**Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* § 416.920(c). If the claimant has a severe impairment, move to step three.

**Step 3:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. (Those Part A criteria are purposely set at a high level, to identify clear cases of disability without further analysis.) If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* § 416.920(d).

**Step 4:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* § 416.920(e)–(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the Commissioner to demonstrate that the claimant, considering his age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 C.F.R. § 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). "Substantial evidence is such relevant evidence as a reasonable mind might

3

accept as adequate to support a conclusion." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (internal quotation marks and citation omitted). Substantial evidence "is more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Id.* (internal quotation marks and citation omitted).

> [I]n evaluating whether substantial evidence supports the ALJ's findings . . . leniency should be shown in establishing the claimant's disability, and . . . the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails.

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, however, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)); *Zirnsak*, 777 F.3d at 610–11 ("[W]e are mindful that we must not substitute our own judgment for that of the fact finder.").

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007) (not precedential).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000). It is also proper to remand where the ALJ's findings are not the product of a complete review which "explicitly

weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted).

### B.   The ALJ's Decision

ALJ West properly followed the five-step process. His conclusions may be summarized as follows.

#### Step 1

At step one, the ALJ determined that Mr. Vargas had not engaged in substantial gainful activity in the relevant period. (R. 23 ¶ 1)

#### Step 2

At step two, the ALJ found that Mr. Vargas had the following severe impairments: "degenerative disc disease; osteoarthritis; and obesity" (R. 23 ¶ 2)

#### Step 3

At step three, the ALJ determined that Mr. Vargas's impairment or combinations of impairments did not meet or medically equal the severity of one of the listed impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A. (R. 23 ¶ 3)

#### Step 4 – RFC /Ability to Perform Past Work

At step four, "[a]fter careful consideration of the entire record," the ALJ found that Mr. Vargas has "the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except he cannot climb ladders, ropes or scaffolds, cannot crawl and can perform all other postural functions only occasionally." (R. 24 ¶ 4) The ALJ also found that Vargas has no past relevant work. (R. 27 ¶ 5)

#### Step 5

At step five, the ALJ considered Mr. Vargas's "age, education, work experience, and residual functional capacity" and the Medical-Vocational Guidelines, and determined that Vargas could perform jobs that exist in significant numbers in the national economy. (R. 27–28 ¶ 9) The ALJ found

that Vargas's additional limitations "had little or no effect on the occupational base of sedentary work." (R. 28)

Accordingly, ALJ West concluded that Mr. Vargas was not under a disability, as defined in the Social Security Act, from August 30, 2011, through August 2, 2013, the date of the ALJ's decision. (R. 28 ¶ 10)

### C.   Analysis of Mr. Vargas's Appeal

Mr. Vargas challenges the ALJ's determinations at steps three, four, and five. At step three, Mr. Vargas argues, the ALJ failed to consider Vargas's obesity individually and in combination with other impairments and generally failed to consider the combined effect of all his impairments. (Pl. Br. 11, 18–22) At step four, Mr. Vargas argues, the ALJ did not properly support his RFC decision—finding a capacity for sedentary work—with evidence that Mr. Vargas can stand and/or walk for two hours each workday. (Pl. Br. 22–27) At step five, Mr. Vargas argues, the ALJ improperly relied on a Social Security Ruling and did not consult a vocational expert or provide Vargas with an opportunity to present his own vocational expert. (Pl. Br. 27–34) Also at step five, Mr. Vargas argues that the ALJ failed to consider, as a borderline case, whether to categorize Vargas as "approaching advanced age," when Vargas was approximately seven months too young to meet that age category's criteria. (Pl. Br. 34–36)

Mr. Vargas requests that this Court reverse the ALJ's decision or remand the decision to the Commissioner for a new hearing and decision. Addressing each of Vargas's arguments in turn, I find that the ALJ's findings do not contain any errors of law or procedure, and they are supported by substantial evidence. The ALJ's decision will therefore be affirmed.

### 1.   The ALJ's Step Three Analysis

The claimant bears the burden of proving that his impairments, whether individually or collectively, equal or meet those listed in Appendix 1. However,

"if a claimant's impairment does not match one listed in Appendix 1, the ALJ is required to perform a comparison between the claimant's impairment(s) and those listed in Appendix 1." *Torres v. Comm'r of Soc. Sec.,* 279 F. App'x 149, 151–52 (3d Cir. 2008); *see also* 20 C.F.R. § 416.926(b). The Third Circuit has stated that step three requires the ALJ to perform "an analysis of whether and why [the claimant's individual impairments], or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Burnett,* 220 F.3d at 119. The ALJ is "not require[d] . . . to use particular language or adhere to a particular format in conducting his analysis"; rather, there must be "a sufficient development of the record and explanation of findings to permit meaningful review." *Jones,* 364 F.3d at 505.

Mr. Vargas's step three argument primarily asserts that his combined impairments are the medical equivalent of Listings 1.02A, 1.04A, or 104C.

### a)    *SSR 02-1p – Obesity*

Obesity was removed as a "listed impairment" in 1999, but, as the Third Circuit has recognized, "this did not eliminate obesity as a cause of disability. To the contrary, the Commissioner promulgated [Social Security Ruling] 00–3p, indicating how obesity is to be considered. This SSR replaced an automatic designation of obesity as a Listed Impairment, based on a claimant's height and weight, with an individualized inquiry, focused on the combined effect of obesity and other severe impairments afflicting the claimant." *Diaz v. Comm'r of Soc. Sec.,* 577 F.3d 500, 503 (3d Cir. 2009) (citing SSR 00–3p, 65 Fed. Reg. 31039, 31040–42 (May 15, 2000)); *see also Webster v. Astrue,* 628 F.Supp.2d 1028, 1031 (S.D. Iowa 2009) (explaining "This SSR points out that obesity is a life long impairment, and that although the obesity listing was deleted, the impairment requires special consideration in the evaluation of a disability claim," and, on remand, directing "both the ALJ and counsel . . . to read this ruling carefully, and then apply it to the facts of Plaintiff's case").

7

In 2002, SSR 00–3p was superseded by SSR 02–1p, 67 Fed. Reg. 57859-02 (Sept. 12, 2002), but SSR 02–1p did not materially amend SSR 00–3p, *see Diaz,* 577 F.3d at 503, so I may rely on prior precedent and interpretations.

SSR 02–1p provides the following guidance:

[W]e consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability. The provisions also remind adjudicators that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. They also instruct adjudicators to consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

. . . .

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. . . . For example, when evaluating impairments under mental disorder listings 12.05C, 112.05D, or 112.05F, obesity that is "severe," ... satisfies the criteria in listing 12.05C for a physical impairment imposing an additional and significant work-related limitation of function and in listings 112.05D and 112.05F for a physical impairment imposing an additional and significant limitation of function. . . . We may also find that obesity, by itself, is medically equivalent to a listed impairment. . . . We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.

Social Security Ruling, SSR 02–1p; Titles II and XVI: Evaluation of Obesity, 67 FR 57859–02. In *Diaz,* the Third Circuit, citing SSR 02–1p, confirmed that "an ALJ must meaningfully consider the effects of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." *Diaz,* 577 F.3d at 504 (remanding where the ALJ acknowledged that claimant's obesity was a severe impairment at step

8

two, but failed to consider its impact, in combination with claimant's other impairments, at step three "as required").

Mr. Vargas stands about 5' 9" and weighed approximately 235 pounds at the time of his hearing before the ALJ on July 12, 2013. (R. 36) However, it appears that Mr. Vargas's weight has fluctuated over the course of the proceedings. At the time of Dr. Potashnik's examination on November 30, 2011, Vargas weighed only 178 pounds. (R. 285) In his brief, Vargas states that he weighs 220 pounds. (Pl. Br. 20)

Mr. Vargas argues that the ALJ did not sufficiently consider obesity on its own at step three. (Pl. Br. 11) I disagree. Pursuant to SSR 02-1p, the ALJ considered this impairment and found that Vargas's obesity was not "attended with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in the listings found in any musculoskeletal, respiratory, or cardiovascular body system listing affected by obesity." (R. 23) Although this analysis is rather brief, it is appropriate given the absence of any medical evidence in the record indicating that Mr. Vargas's obesity has affected his functioning in any way.[3] Further, Vargas points to none. Therefore, the ALJ's analysis of Mr. Vargas's obesity on its own is supported by substantial evidence.

I now proceed to discuss whether the combination of Vargas's impairments, including obesity, meet or medically equal a listing.

### b)    *The Combination of Mr. Vargas's Impairments*

Mr. Vargas further argues that the ALJ did not properly consider whether the combination of his impairments was equivalent in severity to one of the

---

[3]    Vargas also argues that the ALJ failed to consider the effects of Vargas's obesity at steps four and five. (Pl. Br. 16) The ALJ's decision does not mention obesity at steps four and five. However, even if the ALJ did fail to consider Vargas's obesity at those later steps, it would not change the outcome because there is no medical evidence in the record that Vargas's obesity impairs his functioning.

impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Pl. Br. 21) In particular, Vargas alleges procedural error, arguing that the ALJ failed to consider whether the combination of his degenerative disc disease (of both lumbar and cervical discs), knee conditions, and obesity matched the severity of Listings 1.02 or 1.04. (*Id.* at 19–21) He further contends that he has demonstrated a "valid evidence-based argument" that the combined impairments medically equal a listing. (*Id.* at 21) I disagree as to both arguments.

The ALJ stated that "the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." (R. 23) I see no reason to doubt that he considered the combination of impairments. Although the ALJ performed his most detailed analysis of the evidence in connection with the RFC, that evidence sheds light on Mr. Vargas's step three claims. Indeed, in the context of the RFC determination, ALJ West thoroughly considered the objective medical evidence, medical opinion evidence, and Mr. Vargas's subjective complaints to assess the nature and extent of the functional limitations imposed by Vargas's combined impairments. (R. 24–27) Thus, assessing the record as a whole, I am satisfied that the ALJ did consider Mr. Vargas's impairments in combination, including the combination of his degenerative disc disease, knee conditions, and obesity, and found that no combination matched the severity of a listed impairment.

I further find that the ALJ's conclusion is supported by substantial evidence. Mr. Vargas's arguments that his combined impairments medically equal Listings 1.02A, 1.04A, and/or 1.04C are unpersuasive. The arguments as to 1.02A and 1.04C fail because the ALJ determined—supported by substantial evidence—that no evidence supported a finding of Vargas's alleged inability to ambulate effectively. The argument as to 1.04A fails because the ALJ also properly determined that there is no evidence that Mr. Vargas has persistent

motor, sensory or reflex loss, or a positive sitting and supine straight leg raising test.

### (1)   Equivalence to Listings 1.02A and 1.04C

Listings 1.02A[4] and 1.04C[5] both require an "inability to ambulate effectively, as defined in 1.00.B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ determined that the evidence would not support a finding that Vargas is unable to ambulate effectively. (R. 23)

An inability to ambulate effectively "is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." *Id.* at § 1.00B2b (emphasis added) Further:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

---

[4]   A disability under Listing 1.02A requires that the claimant suffer a major joint dysfunction involving "one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

[5]   A disability under Listing 1.04C requires that the claimant suffer a disorder of the spine, particularly

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

*Id.*

Mr. Vargas repeatedly acknowledges that he does not meet the § 1.00B2b general definition because his need for a single cane to independently ambulate limits the functioning of only *one* upper extremity. (Pl. Br. 19–20) Nevertheless, he contends that he is unable to ambulate effectively. (*See* Pl. Br. 18 ("[Mr. Vargas] does indeed manifest 'an inability to ambulate effectively.'"))

Regardless, ALJ West's determination that Vargas has not proven an inability to ambulate effectively is supported by substantial evidence. The only medical opinion related to Vargas's ability to walk a block at a reasonable pace is that of consultative examining physician Dr. Potashnik. On November 30, 2011, Dr. Potashnik found that Vargas was able, more or less ("±"), to walk at a reasonable pace, and, using the cane, he is able to walk one block. (R. 287) Further, in both function reports, Vargas self-reported that he was able to use public transportation. (R. 154, 170) In his October 2011 function report, Vargas stated that he is generally able to go out alone and that he shops for food on his own. (R. 154) Although he later reported in March 2012 that he "very rarely" goes out alone when he cannot find someone to accompany him and that he has a friend do food shopping for him (R. 170), the ALJ, based on substantial evidence described more fully below in Part II.C.2, did not fully credit Mr. Vargas's subjective reports of the severity of his impairment. (R. 26)

In sum, the ALJ's finding that Vargas has not proven an inability to ambulate effectively is supported by substantial evidence. Thus, Vargas does not meet the criteria for Listings 1.02A and 1.04C.

Nevertheless, Mr. Vargas argues that his obesity-related extra body weight compounds his knee and back injuries and that it "goes without saying that [under excessive body weight] an already diseased, partially destroyed and splintering join will become more so, disintegrate further and ultimately collapse." (Pl. Br. 20) Although it is reasonable enough to conclude that an increase in body weight increases the stress on one's knees, Mr. Vargas cites

12

no evidence in support of his medical speculation as to the effect obesity is likely to have on his joints. More importantly, because substantial evidence supports the ALJ's determination that the record does not currently establish an inability to ambulate effectively, the combination of impairments has no effect on this bottom-line functional assessment. As a result, the limiting symptoms of Mr. Vargas's combined impairments do not equal the severity of Listings 1.02A and 1.04C.

### (2)   Equivalence to Listing 1.04A

To render a person disabled under Listing 1.04A, a spinal disorder must result in compromise of a nerve root or the spinal cord with evidence of nerve root compression, limitation of motion of the spine, motor loss accompanied by sensory reflex loss, and (for the lower back) positive straight-leg raising test. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

Mr. Vargas's argument for medical equivalence to Listing 1.04A is somewhat enigmatic. In cataloging his impairments that allegedly medically equal a listing when considered in combination, he asserts that he has "restrictions with regard to the cervical aspect of 1.04A." (Pl. Br. 21)

ALJ West found that this listing was not met "because there is no evidence of persistent motor, sensory or reflex loss, [or] of sitting and supine straight leg raising." (R. 23) That determination is supported by substantial evidence. Dr. Potashnik's cervical spine examination "revealed no tenderness on palpation" and the range of motion was "functional in all planes." (R. 286) Vargas's functional range of motion in all planes negates the "limitation of motion of the spine" requirement as it relates to his cervical spine. As for Vargas's lower back, Dr. Potashnik's lumbar spine examination produced negative straight-leg raising test results in both legs. (R. 25, 286)

At this step, it is Mr. Vargas's burden to prove that his impairments, whether individually or collectively, equal or meet a listing. A vague unsupported reference to "cervical" restrictions does not carry that burden.

13

## 2.    The ALJ's RFC Evaluation

Residual functional capacity is an assessment of the most a claimant can do despite his impairments. *See* 20 C.F.R. § 404.1545. To determine a claimant's RFC, an ALJ must engage in a two-step process: first, consider all of a claimant's symptoms which can reasonably be accepted as consistent with the objective medical evidence, and second, determine how those symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529. Here, ALJ West determined that Vargas had the residual functional capacity to "perform sedentary work" with additional limitations. (R. 24)

To perform sedentary work, a claimant must generally be able to stand and/or walk for two hours in an eight-hour workday.[6] Mr. Vargas argues that the ALJ erred in finding that he is able to perform sedentary work because, he contends, the evidence shows that he cannot stand and/or walk for two hours each workday.

I find that the ALJ sufficiently analyzed the evidence in the record and explained his RFC findings—including his implicit finding as to Vargas's ability to stand and/or walk—which are supported by substantial evidence. In determining the claimant's RFC, the ALJ considered the entire record, including Vargas's testimony, the reports of Drs. Francis Pflum and Rashel Potashnik, and Vargas's medical records from Union County Jail and Lafayette Street Chiropractic Center. (R. 24–27) The ALJ analyzed the evidence from each

---

[6]    As the Commissioner has explained:

> Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday.

(SSR 96-9p)

of these sources and explained the weight he gave to each, commensurate with its supportability and consistency with the record as a whole.[7] (R. 24-27)

First, I will summarize the evidence related to Mr. Vargas's ability to stand and walk during the workday. Then, I will address Vargas's specific arguments that the ALJ erred.

### a) *Evidence of Mr. Vargas's Ability to Stand/Walk*

In September 2008, Mr. Vargas suffered injuries to his lower back and both knees in a motor vehicle accident. (R. 24, 198) In October 2008, Vargas was seen by Dr. Francis A. Pflum for symptoms including an inability to walk without significant pain, right-side limp, and swelling and "clicks and locks" in the right knee. (R. 25, 194, 198) In November 2008, an MRI of Vargas's right knee showed a medial meniscus tear, a popliteal cyst, joint effusion, two osteochondral fractures, and a probable bone contusion. (R. 196)

For his back pain, Vargas underwent a series of chiropractic manipulations under anesthesia ("MUA") conducted by Dr. Jesse Burrini in January 2009. He continued to be treated by Dr. Burrini at Lafayette Street Chiropractic Center for lower back pain that radiated to other parts of his body, including the lower extremities. (R. 231–60) In September 2008, Vargas reported to Dr. Burrini that he was in constant pain and described its severity as 10/10 with 10 representing the most severe pain. (R. 260) However, by March 23, 2009, his pain was "mild and occasional" and had reduced to a 2 or 3/10, and Dr. Burrini terminated Vargas's treatment plan. (R. 231–34)

By November 18, 2009, treatment notes from Union County Jail indicate that despite pain, slight swelling, and slightly positive Lachman's sign in the knee, Vargas's knee condition had improved since his injury and he was able to

---

[7]     The ALJ found that Vargas's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."

15

perform a deep knee bend. (R. 212) An examination on December 9, 2009 found that Lachman signs were negative and Vargas reported much improved comfort after taking Naprosyn. (R. 212) Vargas reports that he underwent arthroscopic surgery on his right knee sometime in 2009. (R. 32–33, 284) He has not received medical treatment for his knees since 2009.[8]

Mr. Vargas applied for SSI benefits on August 30, 2011. Then, on October 16, 2011, Mr. Vargas completed a function report for the Commissioner. He stated that he goes outside daily, walking and using public transportation. (R. 153-54) He is able to go out alone. (R. 154) Vargas also reported that he experiences pain "if standing for [a] period of time," and that he is able to walk for five to ten minutes at a time, then needs to rest for fifteen to twenty minutes before resuming. (R. 156) He noted that he uses a cane, a brace/splint, and a back brace, all prescribed by a doctor in 2008 after the motor vehicle accident. (R. 157) He is able to go food shopping in stores; he reports that shopping takes ten minutes. (R. 154)

On November 30, 2011, at Commissioner's request, Vargas underwent an orthopedic consultative examination conducted by Dr. Rashel Potashnik. (R. 284–287) Vargas presented with complaints of pain in his lower back and both knees, with the right knee in greater pain than the left. (R. 284) He also complained of an inability to "stand too long, . . . walk long distances," or "bend down." (*Id.*) Dr. Potashnik's examination revealed that Vargas's left knee was tender but had both normal strength and normal range of motion ("ROM"). (*Id.* 285) Vargas's right knee was "deformed, swollen, and diffusely tender," with an ROM of 10-120 degrees "with pain and crepitus on ROM and on valgus and varus stress." (*Id.*) The right knee's strength was 4/5. Vargas's "[h]ips and ankles exam was within normal limits," the sensory exam was normal, and

---

[8]     Mr. Vargas explains that he cannot afford treatment; he does not have insurance, and he was denied Medicaid. (R. 48–49)

16

Vargas's muscle strength reflexes were normal at the knees and ankles. (*Id.*) In sum, the "[e]xamination revealed right knee deformity, flexion contracture, weakness, [and] antalgic limp." (*Id.*) As a result, Dr. Potashnik concluded that Vargas "is limited in activities requiring prolonged weight bearing, kneeling, squatting, climbing ladders, crouching, [and] crawling." (*Id.*)

Dr. Potashnik also completed a state agency form requiring information about a claimant's use of a hand-held assistive device. (R. 287) She noted that Vargas was able, more or less ("±"), to walk at a reasonable pace. (*Id.*) Vargas always uses a non-prescribed[9] cane for support while both walking and standing. (*Id.*) Using the cane, he is able to walk one block. (*Id.*)

On December 7, 2011, Dr. Deogracias Bustos, a state agency physician consultant involved in the initial disability determination, found that Mr. Vargas was able to stand and/or walk (with normal breaks) for a total of two hours and sit (with normal breaks) for a total of about six hours in an eight-hour workday. (R. 56)

On March 27, 2012, several months after the initial denial of benefits, Mr. Vargas completed a second function report. (R. 167– 74) At that time, he reported that his "condition" and "ability to do any activities" was "getting progressively worse." (R. 171) Standing "severely hurts" his knees and back, and that he can walk only a short block before requiring a ten-minute rest. (R. 172) He cannot prepare his own meals because his knees give out if he stands for too long. (R. 169) Weather permitting, he goes outside to sit on a bench across the street, and he travels in cars and uses public transportation. (R. 169–170) He tries to get someone to accompany him outside, but when he is unable to get help he will "very rarely" go out alone. (R. 170) He has friends

---

[9]     Mr. Vargas contends that the cane was prescribed, and Dr. Potashnik was mistaken in saying otherwise. (R. 34, 40)

take care of his food shopping. (*Id.*) He keeps his legs elevated while sitting at home watching TV. (R. 171)

Also on March 27, 2012, Mr. Vargas's close friend, Godofredo Perez, completed a third-party function report. According to Mr. Perez, Vargas is unable to "get his legs comfortable because of pain." (R. 160) He does not prepare his own meals because "standing for long periods of time" causes him pain. (R. 161) Sitting for long periods of time also causes him pain. (R. 164) Mr. Vargas goes outside five days per week traveling by car, public transportation, or walking. (R. 162) He walks slowly and with a limp, and he cannot run or play sports. (R. 164) He is able to walk for fifteen minutes, then requiring a ten to fifteen minute rest before resuming. (*Id.*)

At the hearing before the ALJ on July 12, 2013, Mr. Vargas testified that walking worsens the pain in his right knee and that he could walk a short block—but not a long block—without stopping. (R. 41) He always uses a cane to walk, both inside and outside his home. (R. 41–42) At times his knee locks up and he must wait and massage it for it to improve. (*Id.*) He is able to stand only five or ten minutes before his knee "starts . . . acting up" and his back muscles tighten, which is an "uncomfortable feeling." (R. 42–43) Vargas also testified that he has difficulty sitting down; he sometimes needs to stand up and, when seated, his leg must be laid out straight. (R. 43) He spends much of his time at home in the living room watching TV with his leg elevated. (R. 45–46) He treats his pain with over-the-counter painkillers, Tylenol and Tylenol PM. (R. 47)

The ALJ properly considered and balanced all of the foregoing evidence.[10] (R. 24–27)

---

[10]    Although the ALJ does not explicitly cite Mr. Vargas's self-reported function reports or the third-party function report by Mr. Perez, he recites facts about Mr. Vargas's subjective complaints that indicate he has reviewed those sources.

18

### b)   *Mr. Vargas's Arguments for ALJ Error in Evaluating His Ability to Stand/Walk*

Mr. Vargas now argues, on two grounds, that the ALJ erred in finding that he is able to do sedentary work, which requires that he stand and/or walk for a total of at least two hours in an eight-hour workday. (Pl. Br. 24–27) First, Vargas contends that the record contains a medical opinion that he cannot stand and/or walk for at least two hours, and there is no opinion to the contrary. (*Id.* at 24) Second, Vargas argues that the ALJ's RFC determination lacked the specific evidentiary calculus necessary for effective judicial review. (*Id.*) Thus, Vargas argues, the portion of the RFC finding that Vargas can walk and/or stand for two hours in a workday is not supported by substantial evidence. (*Id.* at 26–27)

First, Vargas argues that the Commissioner's consultative examiner, Dr. Potashnik, opined that Vargas cannot stand and/or walk for two hours in a workday. (*Id.* at 24) Vargas's assertion turns out to be an extrapolation from Dr. Potashnik's note that Vargas is precluded from "prolonged weight bearing." (*Id.* (citing R. 285)) However, Dr. Potashnik's narrow conclusion—that Vargas is unable to bear heavy objects for a prolonged period—simply does not carry the expansive meaning that Vargas attributes to it. "Prolonged weight bearing" is not at all the same thing as standing or walking. Undoubtedly, if Dr. Potashnik had concluded that there was a severe limitation on Vargas's ability to stand or walk, she would have simply said so.

Relatedly, Vargas contends that there is no medical opinion in the record that affirmatively states that he *can* stand and/or walk for two hours. (Pl. Br. 24–25) This argument improperly places the burden of proof on the Commissioner in determining the RFC. It is true that the ALJ must consider all relevant evidence in determining the RFC. *Fargnoli v. Massanari,* 247 F.3d 34, 41 (3d Cir. 2001) (citing 20 C.F.R. § 404.1545(a)). However, the plaintiff retains the burden of supporting his alleged RFC limitations. *Bowen v. Yuckert,* 482

19

U.S. 137, 146, 107 S. Ct. 2287, 2294, 96 L. Ed. 2d 119 (1987); *see also* 20 C.F.R. § 404.1545(a) ("In general, you [the plaintiff] are responsible for providing the evidence we will use to make a finding about your residual functional capacity."). Therefore, it is Vargas's burden—not the Commissioner's—to support his allegation that he is unable to stand and/or walk for two hours. There is no medical evidence to support Vargas's assertion; the only support derives from Vargas's subjective complaints and the third-party function report completed by his close friend. Seeing no medical corroboration, the ALJ was entitled to give such subjective complaints (considerably enhanced after the initial denial) little weight.

Second, Vargas argues that the ALJ failed to accompany the RFC assessment with "specific references to evidence of record in support of assessed limitations." (Pl. Br. 24) (citing 20 C.F.R. § 404.1545; SSR 85-16; SSR 96-8p) This argument too lacks merit. ALJ West adequately supported his RFC assessment with a discussion of the evidence and an explanation for his finding that the severity of Vargas's subjective complaints was not entirely credible. In the ALJ's words:

> While it is clear from the record that the claimant is limited in his ability to perform strenuous exertional activity, which I have assessed herein, the claimant's allegations of complete inability to work due to pain and other limiting symptoms are not entirely supported by the record as a whole. In ascertaining the claimant's residual functional capacity and evaluating the credibility of his orthopedic-impairment-related subjective complaints, the medical record reveals some anatomical and physiological pathology in the upper and lower extremities. However, the severity of the claimant's subjective complaints is not supported by the objective clinical and diagnostic test findings. The claimant has been diagnosed with degenerative disc disease and osteoarthritis. However, the claimant's statements concerning his impairments and their impact on his ability to work are not persuasive in light of the reports of treating and examining practitioners.

(R. 26) ALJ West then proceeded to discuss the objective medical evidence demonstrating a substantial reduction in Vargas's pain and improvement in symptoms related to his back and knee injuries. (*Id.*) (citing Ex. 3F; Ex. 4F) He also considered Dr. Potashnik's medical opinion and observed that her assessment of Vargas's limitations is consistent with the RFC determination. (R. 26–27) He also notes that none of the evidence from Vargas's treating physicians indicate that Vargas is totally disabled or subject to limitations greater than determined in the ALJ's RFC assessment. (R. 27) Finally, the ALJ mentions that his RFC assessment is supported by the opinions of the State agency medical consultants, whose opinions are not controlling, but nevertheless must be considered as expert opinion evidence of nonexamining sources.[11] (*Id.*) (citing SSR 96-6p)

In sum, ALJ West's decision adequately indicates the basis for his determination, and the record as a whole supports his conclusion as to Mr. Vargas's RFC. The RFC is thus supported by substantial evidence.

### 3.   The ALJ's Step Five Analysis

#### a)   *Absence of Vocational Expert Testimony*

Mr. Vargas argues that the ALJ failed to support his step five determination with evidence from a vocational expert. (Pl. Br. 27–34) Alternatively, the ALJ did not provide advance notice of his intent to rely on a Social Security Ruling ("SSR") in lieu of a vocational expert, thereby denying Vargas an opportunity to present his own vocational expert. (Pl. Br. 27–34) I hold that because SSR 96-9p directly applies to Vargas's nonexertional limitations, the ALJ's reliance on SSR 96-9p as additional evidence was permissible, even without advance notice.

---

[11]   ALJ West notes that although he agrees with State agency consultants' conclusion that Vargas is not disabled, he does find that Vargas's limitations are greater than those determined by the consultants. (R. 27)

At step five, the Commissioner bears the burden of showing that the claimant can perform work which exists in the national economy, in light of his age, education, work experience, and RFC. 20 C.F.R. § 404.1520(a)(4)(v). That analysis may depend on whether the claimant has only exertional limitations, or has nonexertional limitations. Exertional limitations are impairment-caused limitations that affect a claimant's ability to meet the strength demands of a job: sitting, standing, walking, lifting, carrying, pushing, and pulling. *See* 20 C.F.R. § 404.1569a(b); SSR 96-9p. Nonexertional limitations are impairment-caused limitations that affect a claimant's ability to meet the other demands of a job, including mental capabilities; vision and hearing; postural functions such as climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling; and environmental restrictions. *See* 20 C.F.R. § 404.1569a(c)(1)(i-vi); SSR 96-9p.

Where a claimant has only exertional limitations, the Commissioner may use the Medical-Vocational Rules to determine whether such work exists. The Medical-Vocational Rules set forth tables, or grids, with various combinations of age, education, work experience and RFC, and direct a finding of disabled or not disabled for each combination. *See* 20 C.F.R. Part 404, Subpt. P, App. 2. An ALJ "may rely on these grids to establish that jobs exist in the national economy that a person with the claimant's exertional limitations could perform."[12] *Sykes v. Apfel,* 228 F.3d 259, 263 (3d Cir. 2000). However, this applies only to exertional limitations; where the claimant has nonexertional limitations, the grids provide only a framework, and the ALJ must consider

---

[12]     Mr. Vargas also argues that because he allegedly cannot walk and/or stand for two hours in a workday, he does not meet the minimum exertional demands of sedentary work and, therefore, a disability determination cannot be made by application of the Medical-Vocational Rules grids. (Pl. Br. 33) This argument essentially rehashes his attack on the RFC finding, a contention I have already denied. I hold that, since the ALJ's RFC determination was supported by substantial evidence, his Step 5 determination could permissibly be built upon it.

additional evidence to determine whether there are jobs in the national economy that someone with the claimant's combination of impairments could perform. *Id.* at 270; *see also Allen v. Barnhart,* 417 F.3d 396, 404 (3d Cir. 2005).

Where a claimant has nonexertional impairments, an ALJ is permitted to rely on Social Security Rulings as the additional evidence required under *Sykes v. Apfel*; such SSRs, if directly applicable, may be a permissible substitute for the testimony of a vocational expert. *See Allen,* 417 F.3d at 406 ("While, surely, the Agency can use its rules as a substitute for individualized determination, nonetheless, there must be a 'fit' between the facts of a given case, namely, the specific nonexertional impairments, and the way in which the Rule dictates that such nonexertional limitations impact the base."). But "it must be crystal-clear that the SSR is probative as to the way in which the nonexertional limitations impact the ability to work," and the ALJ must discuss this. *Id.,* at 407.

Here the ALJ cited to SSR 96-9p as additional evidence supporting the grid recommendation. (R. 27–28) SSR 96-9p specifically says that "[p]ostural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly." SSR 96-9p. It also says that an ability to stoop and balance occasionally is required for most unskilled sedentary occupations. *Id.*

The ALJ specifically agreed with Dr. Potashnik's assertion that Vargas "is limited in activities requiring prolonged weight bearing, kneeling, squatting, climbing ladders,[13] crouching, [and] crawling." (R. 27) ALJ West also found that Vargas was limited to "occasional climbing [of] ramps and stairs, balancing,

---

[13]    In addition to limitations on climbing ladders, ALJ West added "climbing . . . ropes or scaffolds." (R. 24)

[and] stooping."[14] (R. 24) Then, explicitly citing SSR 96-9p, the ALJ concluded that:

> the additional limitations have little or no effect on the occupational base of unskilled sedentary work. Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work.

(R. 28) Here, given the "fit" between Vargas's additional nonexertional limitations and the way in which SSR 96-9p evaluates those limitations' impact on the sedentary occupational base, SSR 96-9p is a permissible substitute for the testimony of a vocational expert. *See Allen,* 417 F.3d at 406.

Vargas also contends that the ALJ failed to give advance notice of his intention to rely on the SSR. (Pl. Br. 33) Although the Third Circuit has "urge[d]" that it is always appropriate, "as a matter of fairness," to notify the claimant in advance, such notice is not required in every case. *Allen,* 417 F.3d 407. Where advance notice is absent, "it [is] only appropriate" for a court "to give close scrutiny to the ALJ's reliance on a Ruling." *Id.; see also Breslin v. Comm'r of Soc. Sec.,* 509 F. App'x 149, 155 (3d Cir. 2013) (notice was not required where the "the Rulings the ALJ relied upon . . . applied directly to [the claimant's] non-exertional impairments.") Here, I find that the ALJ's reliance on SSR 96-9p passes close scrutiny because that Ruling applies directly to Vargas's nonexertional limitations.

Thus the ALJ properly relied on SSR 96-9p as additional evidence for using the grid as a framework in conducting step five for a claimant with exertional and nonexertional limitations under *Allen.*

---

[14]     Mr. Vargas alleges that the ALJ purposefully constructed Vargas's RFC to include only nonexertional limitations that would allow him to rely on SSR 96-9p, so as to avoid the use of a vocational expert. (Pl Br. 24, 33) The fact that ALJ West found *more* limitations than did Dr. Potashnik undermines this uncharitable accusation.

### b)  *Application of Age Categories in Borderline Situations*

Finally, Vargas argues that because he was just over seven months shy of his fiftieth birthday at the time of the ALJ's decision,[15] he falls on the borderline between two age categories under the Commissioner's regulations (the "approaching advanced age" category is defined as age 50-54). (Pl. Br. 34–35) In borderline situations, the ALJ must consider whether to use the higher age category when doing so would change the claimant's status to "disabled." (20 C.F.R. § 416.963) Pursuant to the Commissioner's regulations, the Commissioner

> will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.

20 C.F.R. § 416.963. Here, Vargas contends, the ALJ erred by "mechanically" applying the age categories instead of considering whether the older age category would have been appropriate under the circumstances. Had the ALJ applied the "approaching advanced age" category, the Medical-Vocational Rules would have directed a finding that Vargas was disabled in light of his education and previous work experience. 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 201.09.

The question then is whether seven months constitutes "a few days to a few months" prior to "an older age category." The Third Circuit has not established a bright line rule to determine outer limits of the "borderline." However, in a non-precedential opinion, the Third Circuit held that five to six

---

[15] Mr. Vargas was born on March 9, 1964, and he turned 50 years old on March 9, 2014. The ALJ issued his decision on August 2, 2013, just over seven months before Vargas's fiftieth birthday.

months prior to a claimant's fiftieth birthday is not a borderline situation. *Roberts v. Barnhart*, 139 F. App'x 418, 420 (3d Cir. 2005). Despite this non-binding precedent, more recent district court decisions within this circuit have disagreed as to whether seven months is borderline. *Compare Marshall v. Colvin*, No. CIV.A. 13-2411, 2015 WL 1412103, at *5 (W.D. Pa. Mar. 26, 2015) (seven months is not borderline), *with Istik v. Astrue*, No. 02: 07CV1468, 2009 WL 382503, at *5 (W.D. Pa. Feb. 13, 2009) (seven months is borderline).

I am not persuaded that seven months prior to a transition-in-age category is a borderline situation. Non-precedential as the *Roberts* holding may be, the text of the regulation supports it. Although the term "a few months" may be intentionally vague, a "few" does not usually mean as many as seven, and the preceding alternative phrase "a few days" suggests that the court should round downward, not upward. If the Commission were thinking in terms of periods exceeding a half year, there would be no need to refer to a "few" months, let alone a "few days," at all.

Vargas's argument is unpersuasive. ALJ West did not err by failing to consider whether to categorize Mr. Vargas as "approaching advanced age" in the step five application of the Medical-Vocational Rules grids.

## III.   CONCLUSION

The ALJ's denial of Vargas's claims for SSI contains no errors of law and is supported by substantial evidence. It is therefore AFFIRMED. An appropriate order accompanies this Opinion.

Dated: January 11, 2017

**KEVIN MCNULTY**
**United States District Judge**

26